UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROSS DRESS FOR LESS, INC.,     )
    )
        Plaintiff,     )
    )
       v.     )     Case No. 4:18 CV 1289 CDP
    )
ST. LOUIS RETAIL OUTLET, LLC,     )
    )
        Defendant.     )

## MEMORANDUM AND ORDER

Plaintiff Ross Dress for Less, Inc., filed this action in August 2018 seeking money damages from defendant St. Louis Retail Outlet, LLC, for overpaid rent, as well as declarations that it was entitled to exercise its right to terminate its Lease with St. Louis Retail and to recover unamortized costs of leasehold improvements (ULIs) from St. Louis Retail upon such termination. In its counterclaim, St. Louis Retail asserts that the parties settled all disputed issues before Ross filed this case. For the reasons that follow, St. Louis Retail has demonstrated by clear, convincing, and satisfactory evidence that the parties settled this dispute in its entirety in June 2018. I will therefore grant its Motion to Enforce Settlement Agreement and order the parties to comply with the settlement agreement's terms. I will deny Ross's Motion for Summary Judgment on the counterclaim and deny the motion as moot to the extent Ross seeks judgment on the merits of its own claims.

**Background**

Ross Dress for Less operated a retail store as a tenant at St. Louis Mills Mall under a 10-year Lease it entered into with St. Louis Mills Limited Partnership in February 2012. On February 12, 2016, defendant St. Louis Retail purchased the mall from the Partnership and assumed the Lease as landlord. This dispute arises from Ross's claim that the level of tenant occupancy at the mall entitled Ross to recover rent that it had overpaid for a period of years and to invoke its termination rights under the Lease, which included its right to recover ULI costs. St. Louis Retail contends that these issues were fully resolved and settled prior to Ross filing this action, and it seeks to enforce that settlement. I held an evidentiary hearing on St. Louis Retail's motion to enforce settlement on March 13, 2020. On the evidence and testimony before the Court, I will grant the motion.

Relevant to the dispute are the terms of the Lease that govern rent during Reduced Occupancy Periods and Secondary Reduced Occupancy Periods (SROPs), and Ross's right to terminate the Lease (upon notice) if an SROP continued for 24 consecutive months. (ECF 1-1, Lease at § 6.1.3(c).) Also relevant is that term of the Lease that provides: "In the event Tenant terminates this Lease pursuant to Sections 6.1.3(b) or (c) above, Landlord shall pay to Tenant an amount equal to the Unamortized Cost of Tenant's leasehold improvements . . . ." (*Id.* at § 6.1.3(d)) (ULIs).

In a letter dated March 29, 2017, Ross notified St. Louis Retail that it had determined that an SROP had existed at the Mills Mall since May 1, 2015, and that

it was therefore entitled to pay a reduced substitute rent since May 1, 2015, under the terms of the Lease. Ross demanded that St. Louis Retail repay to Ross $199,086.84, which Ross averred was the amount of rent it overpaid from May 1, 2015, to February 28, 2017. (ECF 48-1.) Beginning in March 2017, Ross withheld direct payment of any rent, choosing instead to offset those monthly rent payments against the amount it claimed to have overpaid since May 2015.

In a letter dated September 19, 2017, Ross again provided notice to St. Louis Retail that an SROP had existed since May 1, 2015; again demanded repayment of $199,086.84 in overpaid rent; and, further, informed St. Louis Retail that it (Ross) had the right to terminate the Lease since the SROP had been in effect for at least 24 months. (ECF 48-2.)

On February 28, 2018, Mark Leadlove, an attorney representing Ross, sent a letter to St. Louis Retail reiterating Ross's positions stated in the September 2017 letter – specifically, that an SROP had existed since May 1, 2015; that as a result of a 24-month SROP, Ross had an ongoing option to terminate the Lease; and that Ross was entitled to repayment of $142,520.12 in overpaid rent for the period May 1, 2015, to February 28, 2018. (ECF 48-3.) In a responsive email dated March 2, 2018, St. Louis Retail disputed these assertions. (ECF 48-6.)

After an exchange of additional emails and letters, Leadlove sent a letter to St. Louis Retail on May 15, 2018, stating in relevant part:

There is a Dispute between Landlord and Ross under Article 20 of the

Lease regarding Ross's overpayment of Rent due to the existence of a Secondary Reduced Occupancy Period and Ross's other contractual rights as a result of an SROP, including the right to terminate the Lease and the right to recover for the unamortized cost of leasehold improvements. . . .

As it appears Landlord is not interested in mediating this dispute, Ross asks for Landlord to agree with Ross to waive the mediation requirement so that the parties can proceed to litigation.[1] A copy of a Draft Complaint Ross intends to file is enclosed. . . .

(ECF 48-5, Letter.)  The Draft Complaint that Leadlove included with the letter set out four counts against St. Louis Retail.  Counts II through IV asserted claims of Breach of Contract, Money Had and Received, and Unjust Enrichment, each seeking $142,520.12 in damages for gross rent Ross had overpaid since May 2015. Count I sought a Declaratory Judgment that:

(a)     An SROP exists as of May 1, 2015;

(b)     Ross is entitled to terminate the Lease;

(c)     Upon termination of the Lease, Ross is entitled to the unamortized cost of leasehold improvements; [and]

(d)     Ross is entitled to repayment of its overpaid Gross Rent, plus interest[.]

(*Id.*, Draft Compl. at ¶ 30.)

Attorney Joshua Hackman is general counsel for Namdar Realty Group, the managing agent for St. Louis Retail.  At all times relevant here, Hackman acted as

---

[1] Section 20.2.2 of the Lease provides the right to pursue litigation if a dispute is not resolved by mediation within 60 days of a mediation notice.  Leadlove sent a mediation notice to St. Louis Retail on April 18, 2018.  (*See* ECF 48-4.)

counsel for St. Louis Retail in legal matters involving St. Louis Mills Mall. Hackman testified at the hearing that he became aware of Ross's dispute with St. Louis Retail in March 2018 and received Leadlove's May 15 letter and Draft Complaint. In view of the statements made in Leadlove's letter, the claims raised in the Draft Complaint, and the relief sought in the Draft Complaint, Hackman understood that there were four issues in dispute between Ross and St. Louis Retail: 1) whether an SROP existed since May 2015; 2) whether Ross was entitled to credit for overpayment of rent; 3) whether Ross could terminate the Lease because of the existence of an SROP for 24 months; and 4) whether Ross was entitled to payment for ULIs upon termination of the Lease. With Leadlove's statement that "Ross intended to file" the Draft Complaint, Hackman thought it was clear that Ross intended to litigate all of the asserted claims.

On May 25, 2018, counsel for Ross and St. Louis Retail, including Leadlove and Hackman, participated in a telephone call to discuss settlement. Hackman expressed St. Louis Retail's desire to resolve all disputes, and Ross's counsel proceeded with the idea of trying to avoid filing the lawsuit.

Attorney Nathan Emmons, co-counsel for Ross, also testified at the hearing. In a letter to Hackman dated June 8, Emmons reiterated Ross's positions that an SROP had existed since May 1, 2015, and that Ross had an ongoing option to

terminate the Lease because the SROP had existed for at least 24 months.[2] Emmons also renewed Ross's demand for overpaid rent, which at that time totaled $126,030.16. Emmons rejected Hackman's offer that St. Louis Retail remit overpaid rent only from the time when St. Louis Retail assumed the Lease, that is, from February 2016 rather than from May 2015. Instead, Emmons demanded full payment of the $126,030.16 not later than June 18 and stated that Ross was "prepared to file suit on June 19 to enforce Tenant's rights under the Lease." (ECF 51-186.)

Upon receipt of Emmons' June 8 letter, Hackman emailed Leadlove on June 11:

> We are in receipt of your June 8, 2018 letter. As we discussed over the phone, we would like to resolve this dispute, as well as securing our relationship with Ross. To that end, I propose we schedule a call this week with decision-makers both from Ross and Namdar to resolve all outstanding issues.

(Hrg. Exh. ROS_001284.) Hackman and Emmons spoke again by telephone on June 11 at which time Emmons proposed an outline of settlement terms amenable to Ross. Neither Emmons nor Hackman indicated during this discussion that the proposed terms were intended to settle only part of the dispute. Emmons told Hackman that he would send him a memorialization of the settlement terms, which he did in a June 13 email with a subject line that read "Settlement Offer":

---

[2] Both Mark Leadlove's and Nathan Emmons' names are included in the signature block, but only Emmons signed the letter.

Dear Josh:

As per our conversation over the phone, we propose the following settlement offer.  Given that the 60-day [mediation] period under the Lease expires on June 18, please let us know by that date if Landlord accepts the proposed settlement offer.  If we do not hear back, or if Landlord rejects the settlement offer, we plan to file suit on June 19.

. . .

Sincerely,
Nathan
-----------------

SETTLEMENT OUTLINE

1)  Landlord would acknowledge the existence of a Reduced Occupancy Period as of February 11, 2016 (i.e., the date Landlord acquired the shopping center).

2)  Landlord would acknowledge that Tenant has an ongoing right of termination, to be exercised at Tenant's option in Tenant's sole discretion.

3)  Landlord would acknowledge that Tenant intends to issue a notice of termination in August or September 2018, and that the Store may close in January 2019.  In such event, the Lease would terminate in January 2019. (As a practical matter, this notice is subject to approval by Tenant's executive real estate committee at their meeting in August.)

4)  Landlord would pay to Tenant a net settlement payment in the sum of $42,932.13 representing a reimbursement of the rent overpayment for the period from February 2016 to May 2018 as follows:

| Total gross rent overpayment February 2016 to February 2017 | $115,988.81 |
|---|---|
| Less recovery by rent offset from March 2017 to May 2018 | <$73,056.68> |
| Net settlement payment | $42,932.13 |

Please see the attached rent payment history for the sources of these numbers.

5)  Tenant would waive the rent overpayment for the period prior from May 2015 to January 2016 in the amount of $83,098.03.

6)  Tenant and Landlord will devise and sign a mutually acceptable settlement agreement and other necessary supporting documents.

7)  After the real estate committee meeting in August, the net settlement payment would be reconciled based on actual amount of rent overpayment at that time using the same methodology shown above.

8)  Given that the 60-day period under the lease expires on June 18, Tenant expects a response from Landlord by June 18.

(Hrg. Exh. STLMILLS009913-15.)  Believing that a discrepancy existed in the amount of overpaid rent, Hackman did not accept the offer and asked for documentation in order to reconcile the difference.  Hackman also disagreed with the offer's expectation of an immediate lump sum payment given that the Lease was still in effect.  Hackman and Emmons spoke on the telephone on June 18 regarding these issues, at which time Emmons told Hackman that Ross would not file the complaint on June 19 as previously threatened given that they were working to resolve the issues Hackman raised.

On June 19, Emmons sent to Hackman the following email with the subject line "Settlement Offer":

Dear Josh:

As per our conversation over the phone, we propose the following settlement offer.  As listed in Point 8 below, we would expect a definitive yes or no response by this Friday, June 22, 2018.

. . .

Sincerely,
Nathan
-----------------

SETTLEMENT OUTLINE

1)  Landlord would acknowledge the existence of a Reduced Occupancy

Period as of February 11, 2016 (i.e., the date Landlord acquired the shopping center).

2) Landlord would acknowledge that Tenant has an ongoing right of termination, to be exercised at Tenant's option in Tenant's sole discretion.

3) Landlord would acknowledge that Tenant intends to issue a notice of termination in August or September 2018, and that the Store may close in January 2019. In such event, the Lease would terminate in January 2019. (As a practical matter, this notice is subject to approval by Tenant's executive real estate committee at their meeting in August.)

4) As of June 18, 2018, Landlord would acknowledge a (net) rent overpayment amount in the sum of $42,932.13 as set forth below. Landlord would also agree that Tenant can continue to offset this rent overpayment amount against rent amounts otherwise due under the lease until Tenant has recovered the full amount of the rent overpayment. Once tenant has recovered the full amount of rent overpayment, then Tenant would resume payments of substitute rent in accordance with the Lease. In the event the Lease is terminated prior to full recovery of the rent overpayment amount, then Landlord would be obligated to make a lump sum payment to Tenant equal to any remaining overpayment amount upon termination of the lease. The rent overpayment would also be reconciled in the final settlement documents to reflect the (then) current amount of the rent overpayment.

| | |
|---|---|
| Total gross rent overpayment February 2016 to February 2017 | $115,988.81 |
| Less recovery by rent offset from March 2017 to May 2018 | <$73,056.68> |
| Net settlement payment | $42,932.13 |

Please see the attached rent payment history for the sources of these numbers.

5) Tenant would waive the rent overpayment for the period prior from May 2015 to January 2016 in the amount of $83,098.03.

6) Tenant and Landlord will devise and sign a mutually acceptable settlement agreement and other necessary supporting documents.

7) After the real estate committee meeting in August, the net settlement payment would be reconciled (if necessary) based on actual amount of rent overpayment versus actual offset taken at that time using the same methodology shown above.

8) We would expect a definite response from landlord by Friday, June 22. The parties would then use good faith, diligent efforts to finalize the settlement documents by Friday, July 13. Landlord would then use diligent

good faith efforts to deliver signed counterparts of the final settlement documents by Friday, July 20, to be held in escrow pending the REC meeting in August.

(ECF 48-9.)  Hackman responded to this email on June 22 and accepted the settlement offer *in toto*, with no additions or alterations:  "As discussed, we agree to the terms outlined below, and look forward to working with you to finalize a settlement agreement."  (ECF 48-10; ECF 62-1 ¶ 14.)  The "terms outlined below" were the terms contained in Emmons' June 19 email.  (ECF 48-10.)

St. Louis Retail seeks to enforce this June 22 Settlement Agreement.

Given the course of negotiations and Emmons' representation on June 18 that Ross would not file the lawsuit since they were working toward settlement, Hackman understood that the parties intended to settle the dispute in its entirety, including the issue raised in the Draft Complaint regarding what St. Louis Retail would pay to Ross upon Ross's termination of the Lease.  Accordingly, with his June 22 mirror-image acceptance of Emmons' June 19 offer that included such a term, Hackman understood that they had settled all of the disputed issues between Ross and St. Louis Retail – including all claims raised in Ross's Draft Complaint – which was consistent with his intention to "resolve all outstanding issues" as stated in his June 11 letter to Leadlove and with Ross's intention to avoid filing the lawsuit.

Gregg McGillis, Group Executive Vice President of Property Development for Ross, testified at the hearing that he was aware of and became involved in the

dispute with St. Louis Retail in 2018. At that time, McGillis understood that the issues involved the amount of rent Ross overpaid during periods of SROP, the ability of Ross to terminate the Lease after a period of SROP, and payment of ULIs to Ross upon termination of the Lease based on SROP. McGillis was also aware of discussions being held to resolve the dispute.

Shortly after Hackman accepted Emmons' offer on June 22, Emmons prepared a draft settlement agreement and presented it to Ross Vice President McGillis for review before sending it to St. Louis Retail's lawyers. McGillis noted that the draft agreement did not include any language regarding the nearly $500,000 in ULI costs, which, based on the terms agreed to in the settlement – that is, that an SROP existed since February 2016, that Ross would provide notice of termination based upon SROP, and that the Lease would likely terminate in January 2019 based on SROP – McGillis believed St. Louis Retail would be obligated to pay to Ross upon termination of the Lease. McGillis testified that he instructed Emmons to include the ULI payment in the final agreement as a matter of courtesy so that St. Louis Retail understood that it was part of the settlement.

Emmons called Hackman on June 27 with this information and told him that the ULI payment term would be included in the settlement agreement. Hackman expressed surprise given that they had already agreed to what would occur upon termination of the Lease, and payment of ULIs was not a part of that agreement. Hackman considered the ULI term to be new and not a part of the agreement that

had already been reached. After this telephone conversation, Emmons emailed to Hackman a final settlement agreement that included the terms set out in the June 22 Settlement Agreement. An additional section entitled "Limited Mutual Releases" was also included that contained the following clause:

> 4.3 Full Force and Effect. Except for the Limited Mutual Release and Claims related to the Dispute set forth in Section 4.1 and Section 4.2 above, Landlord and Tenant hereby agree that the Lease remains in full force and effect without modification including, without limitation, Landlord's obligations under Section 6.1.3(d) of the Lease. As of the Effective Date, Landlord hereby acknowledges that the current amount of the "Unamortized Cost" that Landlord would be obligated to pay to Tenant under Section 6.1.3(d) is Four Hundred Ninety Thousand Two Hundred Ninety-Six and 00/100 Dollars ($490,296.00).

(ECF 48-11.)

Hackman emailed Emmons on July 3 memorializing his frustration at Ross's insertion of the ULI term in the settlement agreement: "Needless to say, the 'unamortized cost' issue was never discussed by the parties until after we had agreed to a settlement-in-principle." (ECF 58-4.) Hackman requested documentation to support Ross's claim of nearly $500,000 in ULIs. (*Id.*)

Ross filed this lawsuit on August 6, 2018, raising the same claims as set out in the Draft Complaint provided to St. Louis Retail on May 15, 2018, and averring that it was owed $121,000.10 in overpaid rent and would be owed $490,295.99 in ULIs if the Lease were terminated on January 31, 2019. (ECF 1; ECF 6.) On September 12, 2018, Hackman offered $5000 to resolve the ULI issue in an effort

to avoid additional litigation costs.  Ross rejected that offer.

On November 28, 2018, Ross provided notice to St. Louis Retail that it would terminate the Lease on January 31, 2019, under § 6.1.3(c) of the Lease for the reason that an SROP had been in existence for at least 24 months.  (ECF 51-184.)  Ross terminated the Lease on January 31, 2019.  (ECF 48-12.)  From June 18, 2018, to January 31, 2019, Ross continued to offset its rent overpayment amount against rent amounts otherwise due to St. Louis Retail under the Lease. The amount of rent Ross offset between June 2018 and January 2019 totaled $30,608.28.  (ECF 48 at ¶¶ 14, 15; ECF 57 at header p. 7.)  On January 24, 2019, Ross filed an amended complaint, adding allegations about its notice to terminate the Lease, omitting the claim for declaratory judgment, and adding a prayer for $488,936.77 in money damages for the amount of ULIs as of January 31, 2019.

### Discussion

"District courts have inherent power to enforce a settlement agreement as a matter of law when the terms are unambiguous."  *Barry v. Barry*, 172 F.3d 1011, 1013 (8th Cir. 1999).  A party moving to enforce must prove the existence of the settlement agreement by clear, convincing, and satisfactory evidence.  *Matthes v. Wynkoop*, 435 S.W.3d 100, 106 (Mo. Ct. App. 2014).  "Evidence is clear and convincing if it instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition, [such that] the fact finder's mind is left with an abiding conviction that the evidence is true."  *Id.* (internal quotation marks and citations

omitted).

"In a diversity case, the settlement contract must be construed according to state law." *Barry*, 172 F.3d at 1013. Here, neither party addresses the issue of which state's law governs the present contract question in this diversity case. Ross is a Virginia corporation whose principal place of business is in California. St. Louis Retail is an LLC whose lineage of members ultimately ends in persons who are citizens of New York. The settlement discussions addressed matters that occurred in the Eastern District of Missouri, which is where Ross threatened litigation and ultimately filed its lawsuit. Both parties cite to and rely on Missouri law in their respective arguments regarding the June 22 Settlement Agreement, the validity of which is under consideration here. I will therefore infer that the parties agree that Missouri contract law applies to this dispute.

Under Missouri law, the essential elements of a valid settlement agreement are the involvement of parties who are competent to contract, a proper subject matter, legal consideration, mutuality of obligation, and mutuality of agreement. *Chaganti & Assocs., P.C. v. Nowotny*, 470 F.3d 1215, 1221 (8th Cir. 2006) (citing *L.B. v. State Comm. of Psychologists*, 912 S.W.2d 611, 617 (Mo. Ct. App. 1995)). "The creation of a valid settlement agreement requires a meeting of the minds and a mutual assent to the essential terms of the agreement." *St. Louis Union Station Holdings, Inc. v. Discovery Channel Store, Inc.*, 301 S.W.3d 549, 552 (Mo. Ct. App. 2009). A meeting of the minds or mutual assent is reached when the minds

of the contracting parties meet upon and assent to the same thing in the same sense at the same time. *Grant v. Sears*, 379 S.W.3d 905, 916 (Mo. Ct. App. 2012). To determine whether there was mutuality or meeting of minds, I look to the parties' intentions as expressed or manifested in their words or acts, and not to their secret intentions. *Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc.*, 528 F.3d 556, 561 (8th Cir. 2008) (quoting *Butler v. Missouri Ins. Co.*, 187 S.W.2d 56, 60 (Mo. Ct. App. 1945)); *Chaganti & Assocs.*, 470 F.3d at 1221.

The words and acts expressed by Ross and St. Louis Retail throughout their settlement negotiations and culminating in the June 22 Settlement Agreement show that both parties intended to settle all issues in dispute so that litigation could be avoided. These negotiations involved back-and-forth discussions during which Ross expressly told St. Louis Retail that it would not file the Draft Complaint on June 19 as anticipated because the parties were close to settlement. As represented, Ross did not file the Draft Complaint on June 19 but instead submitted to St. Louis Retail its Settlement Offer, which expressly included terms outlining in detail what St. Louis Retail would pay to Ross upon termination of the Lease based on a 24-month SROP. Ross's express decision to 1) forego filing the Draft Complaint that included a claim that St. Louis Retail was obligated to pay ULIs to Ross upon termination of the Lease and 2) offer a settlement that expressly set out what St. Louis would pay to Ross upon termination of the Lease, and St. Louis Retail's unequivocal acceptance of that offer, leaves me with an abiding conviction

that the June 22 Settlement Agreement resolved all issues, including the issue involving ULI payment.

Ross argues, however, that no binding settlement was created on June 22 because there was no meeting of the minds on all the essential terms necessary to resolve the disputed issues, specifically terms relating to ULI payment, rights and obligations in the event of Lease termination, and release. I disagree.

When Ross and St. Louis Retail began settlement negotiations, the disputed issues on the table were the existence and length of an SROP, the overpayment of rent, Ross's right to terminate the Lease based on SROP, and Ross's right to collect ULIs upon an SROP-based termination of the Lease. At no time during these negotiations did these issues narrow and, indeed, Ross's threatened litigation on *all* issues remained until the negotiations resulted in Ross's final Settlement Offer on June 19. Throughout these negotiations, Hackman made it clear to Ross that St. Louis Retail intended to resolve "all outstanding issues"; and at no time did Ross or any of its representatives correct or clarify Hackman's understanding or indicate to Hackman or to any other St. Louis Retail representative that settlement discussions were intended to resolve only some of the issues. Indeed, Ross entered into these settlement negotiations with the intention to avoid litigation – litigation that would have presumably involved all claims raised in the Draft Complaint that Ross threatened to file on June 19.

"'Any reservation or limitation as to the scope of a settlement agreement

must be clearly expressed.'" *Bath Junkie Branson*, 528 F.3d at 562 (quoting *Fiegener v. Freeman-Oak Hill Health Sys.*, 996 S.W.2d 767, 773 (Mo. Ct. App. 1996)). "Therefore, even if a party may have subjectively believed that it had outstanding important contractual terms, a court will still enforce a settlement agreement that the record reflects contains all material terms." *Id. See also Biologix Franchise Mktg. Corp. v. Logic*, Case No. 4:18CV00714 AGF, 2020 WL 33108, at *4 (E.D. Mo. Jan. 2, 2020) (where one party may now be unhappy with some or all of the terms, the fact that it decides after the fact that a contract is not to its liking does not provide reason to release it from its obligation).

The settlement agreement reached on June 22 upon St. Louis Retail's acceptance of Ross's June 19 Settlement Offer *in toto* contained all the material terms necessary to resolve all issues in dispute between the parties, including what St. Louis Retail would pay to Ross upon Ross's anticipated termination of the Lease based upon a 24-month SROP – which the parties agreed would be a "net settlement amount" of overpaid rent that remained due to Ross at the time of termination.[3] It was not until days after the parties mutually agreed to these terms that Ross stated that it had intended that St. Louis Retail would still owe it approximately $500,000 in ULIs upon termination of the Lease. But the settlement

---

[3] The inclusion of the term "net settlement amount" would lead any reasonably prudent person to conclude that no additional monies were expected upon termination of the Lease or at any other time. *See Fiegener*, 996 S.W.2d at 773.

reached on June 22 was not ambiguous and did not lack any essential contractual elements. Neither during the course of negotiations nor in its offered terms did Ross indicate that it intended to limit the settlement to only certain disputes or that it expected to recover monies in addition to what the parties expressly agreed upon termination of the Lease. Although Ross presented evidence that McGillis thought that the settlement would include St. Louis Retail's payment of ULIs, Ross's belated articulation of its subjective intent cannot alter the terms of the contract entered into earlier. I cannot consider what a party "secretly intended or what they might have said if they had decided to further explain their intentions." *Fiegener*, 996 S.W.2d at 773. *See also Bath Junkie Branson*, 528 F.3d at 562 (settlement agreement that contains all of the material terms will still be enforced even if a party may have subjectively believed that there remained outstanding important contractual terms).

Ross also argues that the June 22 Settlement Agreement could not have encompassed the ULI issue because resolution of that issue was dependent upon unknown future contingencies, *i.e.*, if and when Ross would give notice of Lease termination, and the actual value of ULIs upon termination. This argument fails for two reasons. First, contracts contain terms regarding future contingencies all the time. And indeed, the June 22 Settlement Agreement here – which, notably, was based wholly on Ross's Settlement Offer – contained terms involving future events, including Ross's ongoing right to terminate the Lease that Ross could

exercise at its discretion; Ross's intention to issue notice of termination in the future whereupon, "in such event," the Lease would terminate in January 2019; and St. Louis Retail's obligation to make a lump sum payment of overpaid rent "in the event" the Lease terminated prior to full recovery.

Second, the future contingencies relevant here were not so unknown as Ross contends. Hackman understood from the settlement discussions that obtaining approval from Ross's real estate committee to terminate the Lease and give notice thereof was a mere formality and that such termination was inevitable. Indeed, Ross articulated in its Settlement Offers dated June 13 and June 19 that it "intend[ed] to issue a notice of termination in August or September 2018" after which "the Lease would terminate in January 2019," and that such notice was subject to approval by Ross's real estate committee "as a practical matter" at its August 2018 meeting. And McGillis testified at the hearing that it was highly likely that the real estate committee, of which he was a member, would approve terminating the Lease at its August 2018 meeting given that this particular store was underperforming and going in the wrong direction, thereby making it a good candidate for termination. Accordingly, if and when Ross would provide notice of Lease termination was not so unknown so as to preclude resolution of the ULI issue. And, regarding the purported unknown value of ULIs upon termination, I note that within days of the June 22 Settlement Agreement, Ross was able to assign a precise dollar amount to the ULIs as they existed at that time. With this

information, it would not have been a cumbersome task to extrapolate what the value of ULIs would be on January 31, 2019, which was the date set out in the June 22 Settlement Agreement that Ross anticipated terminating the Lease.

Under the terms of the Lease, the triggering event for payment of ULIs is termination of the Lease upon notice after a 24-month period of SROP. The June 22 Settlement Agreement contains this triggering mechanism and sets out a precise time frame during which this mechanism was expected to occur. In view of the Settlement Agreement's inclusion of this mechanism as well as other future events, I reject Ross's argument that ULIs could not be particularly considered in settlement because of their future contingent nature.

Ross also argues that no enforceable settlement exists here because the parties did not agree to a form of release. Citing *Sherrard v. The Boeing Co.*, No. 4:13-CV-1015-CEJ, 2016 WL 3903212 (E.D. Mo. July 19, 2016), and *Schultz v. Verizon Wireless Servs., LLC*, 833 F.3d 975, 979 (8th Cir. 2016), Ross argues that a form of release is material to any settlement agreement, and thus that the absence of such a term here necessarily renders the supposed settlement unenforceable. Ross's argument is misplaced.

*Sherrard* involved a purported settlement of a putative class action. In a series of email exchanges, the three named plaintiffs first offered to settle the case in exchange for a sum certain for each plaintiff. Boeing counteroffered with a lesser sum, conditioned on all three plaintiffs accepting, which plaintiffs did.

"Apart from accepting the money, the emails did not specify what the plaintiffs would be obligated to do in return." 2016 WL 3903212, at *1. Boeing submitted draft settlement agreements with draft releases, which plaintiffs refused to execute. Plaintiffs moved to enforce the settlement agreement that they claim had been reached with the email exchanges, contending that the emails formed a contract to settle the plaintiffs' claims for equal sums in exchange for a full release of liability and a dismissal with prejudice of all claims. *Id.* at *1-2.

The court in *Sherrard* found that a valid settlement had not been reached because, in the context of that case, the form of release was a material term to the settlement contract. Without it, there was no consideration for Boeing. The emails did not include what plaintiffs would give up in exchange for money – plaintiffs merely agreed to accept money from Boeing. The form of release was therefore material to the settlement because it was only the release that constituted what plaintiffs would be giving up in exchange for money. And given that the case was a putative class action that had the potential to involve several known and unknown individual plaintiffs, the form of release with respect to whether the settlement resolved the named plaintiffs' claims, the case, or both was material in the circumstances. But because a release was neither negotiated nor agreed to, there was no settlement given the lack of mutual assent to this material term. 2016 WL 3903212, at *4.

This case is not a class action and involves one plaintiff and one defendant

with discrete claims. The uncertainty about the number and scope of claims that could be resolved by this settlement is not present here. Moreover, unlike in *Sherrod*, there was mutual consideration in Ross's settlement offer and in St. Louis Retail's acceptance. In exchange for St. Louis Retail's 1) acknowledgement of an SROP since February 11, 2016; 2) acknowledgement of Ross's right to terminate the Lease and intention to give notice of termination; and 3) payment to Ross of rent overpayment for the period of February 2016 to February 2017, Ross agreed to waive (*i.e.*, give up) rent overpayment from May 2015 to January 2016. Because the June 2018 email exchange reached accord on the material issue of what obligations each side would incur, the resulting June 22 Settlement Agreement is valid and enforceable.

Ross also cites *Schultz* for the proposition that "the form of the release and dismissal order is a material part of any settlement." 833 F.3d at 979. In *Schultz*, however, the settlement negotiations resulted in Verizon's offer of a sum certain monetary payment to plaintiffs.[4] The plaintiffs accepted the offered amount and sent Verizon a proposed release to review. In response, Verizon prepared a proposed settlement agreement but included a non-disparagement provision in the release. The plaintiffs ultimately refused to accept the non-disparagement clause

---

[4] Somewhat similar to the circumstances in *Sherrod*, there appeared to be no consideration for Verizon in this offer.

and refused to sign the agreement. *Id.* at 977-78. Applying Iowa law, the Eighth

Circuit found that no settlement had been reached because the parties had not

mutually assented to all material terms, which, in the circumstances of that case,

included the form of release. *Id.* at 979. The Eighth Circuit first noted that

Verizon's email regarding a compromised settlement amount was not framed as a

complete settlement proposal and, further, that plaintiffs' response included a

proposed release, which spurred continued negotiations. *Id.* Given that the form

of release was part of the initial exchange and was offered by plaintiffs in response

to Verizon's offer,[5] the Eighth Circuit found the release to be material, as

demonstrated by the parties' ongoing negotiations and lack of initial agreement.

*Schultz*, 833 F.3d at 979.

Here, Emmons framed the June 19 email as a "Settlement Offer" without

qualification or limitation and instructed that a "definitive yes or no response" was

required by a date certain. The email was not framed as merely another step in

negotiations nor did it indicate that continued discussions were necessary on any

material terms. The offer contained terms of consideration for both parties, as

described above. And Hackman's unequivocal acceptance of the offer did not

contain any additional or different terms. No terms were left open or uncertain.

---

[5] Although the Eighth Circuit did not describe it as such, it would appear that plaintiffs' response
to Verizon's offer would constitute a counteroffer under Missouri law. *See Grant*, 379 S.W.3d at
915 (purported acceptance that contains additional or different terms is a counteroffer).

"To show a legal, valid settlement agreement, one must prove the essential elements of a contract: offer, acceptance and consideration." *Matthes*, 435 S.W.3d at 107 (internal quotation marks and citation omitted). The absence of a release does not render a settlement agreement unenforceable where the parties contemplate that a release will be signed at a later time. *Id.* Because the June 22 Settlement Agreement contains all the essential elements of a contract, includes the the essential terms necessary to resolve the entirety of the dispute, and is sufficiently definite to enable me to give the terms exact meaning, the agreement is valid and enforceable regardless of its lack of an express form of release. *Id.*

Finally, citing *BP Prod. N. Am., Inc. v. Wallis Petroleum, L.C.*, No. 406CV01110ERW, 2007 WL 1240261 (E.D. Mo. Apr. 27, 2007), Ross argues that St. Louis Retail's post-settlement conduct in seeking documentation regarding the value of ULIs and in offering $5000 to resolve the ULI issue shows that negotiations were ongoing and thus that there was no earlier meeting of the minds on this material issue. The circumstances in *BP*, however, are inapposite to those here.

The parties in *BP*, acting without counsel, orally agreed to terms of a settlement regarding replacement of a service station sign. Significantly, however, when the parties reached their agreement, they also agreed *at that time* to continue negotiating the additional terms of a formal settlement document. 2007 WL 1240261 at *1. When counsel then exchanged documents, draft agreements, and

correspondence regarding the formal settlement, it became apparent to plaintiff's counsel that the parties had not discussed a contingency plan in the event municipal approval for the new sign could not be obtained. Defendant's counsel would not agree to terms addressing the contingency and, further, balked at a term of the earlier agreement unless plaintiff agreed to pay attorney's fees. *Id.* Plaintiff moved to enforce the settlement that was initially reached between the parties. On the evidence presented, the court held that the initial meeting between the parties did not constitute an enforceable settlement because: 1) while the parties discussed settlement, the material terms were incomplete and "the parties did not conclude the meeting with full agreement that a settlement had been reached"; 2) counsel, *who were not present at the meeting*, thereafter circulated drafts, modified terms, and added substantive terms to the "proposed agreement"; and 3) an impasse occurred during the negotiation of material terms. *Id.* at *2.

In the circumstances here, counsel negotiated the terms of a settlement that culminated in Ross's captioned "Settlement Offer" with a drop-dead date for acceptance or rejection, and which St. Louis Retail accepted with no additions or alterations. The parties' expressed words and acts show that the June 22 Settlement Agreement was actually considered a complete settlement and not merely another step in the negotiations, especially given Ross's decision to forego filing the lawsuit because settlement was imminent. Moreover, unlike in *BP*, during the settlement discussions here and in agreeing to the resulting settlement

terms, neither the parties nor counsel indicated that there would be continued negotiations regarding any term or other dispute.  Nothing in the June 22 Settlement Agreement shows that a term of the bargain was left open or uncertain.[6]

I credit St. Louis Retail's explanation that its post-settlement request for ULI information and its $5000 post-settlement offer were cost-saving measures given Ross's post-settlement decision to pursue litigation.  Given that the June 22 Settlement Agreement is valid and enforceable for the reasons cited earlier in this memorandum, St. Louis Retail's post-settlement conduct does not affect my decision that the original agreement was reached under well-settled contract principles.  *Cf. Vulgamott v. Perry*, 154 S.W.3d 382, 392 (Mo. Ct. App. 2004) (when a settlement agreement is shown to be valid and enforceable, post-settlement conduct may show a party's repudiation of the agreement, but whether the original agreement was reached under contract principles is not in question).

## Conclusion

"'A mutual agreement is reached when the minds of the contracting parties [] meet upon and assent to the same thing in the same sense at the same time. . . . A meeting of the minds occurs when there is a definite offer and an *unequivocal acceptance*.'"  *Grant*, 379 S.W.3d at 916 (quoting *Kunzie v. Jack-in-the-Box, Inc.*,

_____

[6]  To the extent Ross also cites *Schultz* to argue that St. Louis Retail's subsequent conduct showed continued negotiations rather than a completed settlement, *Schultz* is distinguishable from this case for the reasons set out earlier in this memorandum.

330 S.W.3d 476, 483-84 (Mo. Ct. App. 2010)) (emphasis in *Kunzie*). For the reasons set out above, St. Louis Retail has demonstrated by clear, convincing, and satisfactory evidence that the parties entered into a valid and enforceable settlement agreement on June 22, 2018, that settled all issues in dispute upon which this litigation is based. The terms of the June 22 Settlement Agreement are unambiguous. I will therefore order enforcement of the June 22 Settlement Agreement.

Accordingly,

**IT IS HEREBY ORDERED** that defendant St. Louis Retail Outlet, LLC's Motion to Enforce Settlement Agreement [46] is **GRANTED.**

**IT IS FURTHER ORDERED** that plaintiff Ross Dress for Less, Inc.'s Motion for Summary Judgment [49] is **DENIED as moot** to the extent it is directed to the merits of its claims raised in this litigation, and **DENIED** to the extent it seeks judgment as a matter of law on defendant St. Louis Retail Outlet, LLC's counterclaim asserting the validity and enforceability of the June 22 Settlement Agreement.

In view of Ross Dress for Less, Inc.'s termination of the Lease on January 31, 2019,

**IT IS FURTHER ORDERED** that, in accordance with paragraph 4 of the June 22 Settlement Agreement, defendant St. Louis Retail Outlet, LLC, shall make a lump sum payment to plaintiff Ross Dress for Less, Inc., in the amount of

$12,323.85, which is equal to the rent overpayment amount that remained on January 31, 2019, from the total gross rent overpayment from February 2016 to February 2017.  This lump sum payment shall be made within thirty (30) days of the date of this Order.  In accordance with paragraph 5 of the June 22 Settlement Agreement, Ross Dress for Less, Inc.'s claim for rent overpayment for the period May 2015 to January 2016 in the amount of $83,098.03 is deemed waived.

**IT IS FURTHER ORDERED** that within seven (7) days of remitting the remaining rent overpayment to Ross Dress for Less, Inc., defendant St. Louis Retail Outlet, LLC, shall certify to the Court that such payment was made.  Upon certification of payment, this case will be dismissed in its entirety with prejudice.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 7th day of April, 2020.